# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-19-00705-CV

---

### Y. S., Appellant

### v.

### Texas Department of Family and Protective Services, Appellee

---

### FROM THE 98TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-16-004591, THE HONORABLE JAN SOIFER, JUDGE PRESIDING

---

## MEMORANDUM OPINION

Following a jury trial, Y.S., who is the maternal grandmother of the child who is the subject of this suit, M.H., appeals from the trial court's modified final decree of conservatorship that removed the Grandmother as the nonparent sole managing conservator and appointed the Texas Department of Family and Protective Services in her place.[1]  In her sole issue, Grandmother argues that the evidence is legally and factually insufficient to support that a material and substantial change in circumstances had occurred to either her or Child.  *See* Tex. Fam. Code § 156.101 (stating grounds for modifying order establishing conservatorship). Because we conclude that the evidence is legally and factually sufficient to support the challenged finding, we affirm the modified final decree of conservatorship.

---

[1] We refer to Y.S. by her initials or as "Grandmother"; M.H. as "Child"; Y.S.'s daughter and mother of Child, B.S., by her initials or as "Mother"; and other family members by their initials, including Mother's child N.H., who was born in July 2018.  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

**Background**

In August 2016, the Department filed a suit affecting the parent-child relationship that concerned Child, who was a few weeks old. The Department sought to terminate the parental rights of B.S., who was Child's mother, and the father. Grandmother, who is Child's maternal grandmother, intervened in the suit and, acting pro se, participated in the jury trial that occurred in January 2018. In accordance with the jury's verdict, the trial court orally "pronounced and rendered" judgment on February 2, 2018, and signed a final order on April 16, 2018, terminating parental rights and appointing Grandmother as Child's sole managing conservator.

On August 14, 2018, the Department filed a motion to modify the final order and requested extraordinary relief supported by affidavit. In the motion to modify, the Department requested that Grandmother be removed as the nonparent sole managing conservator of Child and the Department or a competent adult recommended by the Department be appointed in her place. *See id.* § 153.005 (addressing appointment of sole or joint managing conservator). The Department alleged that the circumstances of Child, a conservator, or a party affected by the order had materially and substantially changed after the rendition of the final order and that modification was in the best interest of Child. *See id.* § 156.101. The supporting affidavit for extraordinary relief was from a Child Protective Services (CPS) investigator who averred about an incident on August 12, 2018, involving Grandmother and her maternal grandchild, N.H., who was born to Mother in July 2018. Grandmother took N.H., who was a few weeks old, to the hospital where he was treated for unexplained fractured bones that medical professionals determined to be caused by non-accidental trauma. Grandmother provided several inconsistent stories regarding N.H. and Mother "as well as what happened to cause the fractures."

2

The jury trial on the Department's motion to modify Child's conservator occurred in August 2019. Grandmother, acting pro se, participated in the jury trial. She testified on her own behalf as well as calling Child's maternal great aunt. Grandmother testified that N.H. was injured while in the care of one of Mother's friends and that, after Mother called her, Grandmother picked N.H. up and took him to the hospital. She also testified that the doctors and social workers at the hospital "fabricated the story" about what happened. The maternal great aunt testified that Child was with her when Grandmother took N.H. to the hospital and that Child was "never in immediate danger." The maternal great aunt, however, "plead[ed] the Fifth" and refused to answer questions about the Department's efforts to locate another child of Mother—E.P., who was born in July 2019.

The Department's witnesses included the CPS investigator who provided the affidavit in support of extraordinary relief with the Department's motion to modify, other Department employees, a pediatrician who examined N.H. at the hospital in August 2018, police officers and a social worker who had contact with Grandmother at the hospital, the CASA volunteer and supervisor assigned to Child, Child's foster parents, and psychologists and a psychiatrist who evaluated Grandmother. The Department's exhibits included N.H.'s medical records related to his hospitalization in August 2018, the psychiatrist's evaluation from May 2019, a psychological evaluation from October 2018, and pleadings in the case.

The Department presented evidence about its safety concerns for Child, who was two years old and nonverbal and whose whereabouts were unknown at the time of N.H.'s unexplained injuries. The pediatrician who examined N.H. at the hospital testified about N.H.'s arm and knee fractures, describing the injuries and explaining that, because the unexplained injuries were determined to be caused by trauma to a young child, N.H. was admitted to the

hospital to try to establish a "safe placement" for him, and CPS and law enforcement were contacted. The CPS investigation supervisor testified that Grandmother was informed that she would not be allowed to leave the hospital with N.H. and that, if she did, "she would be making a choice that would be concerning" and that the Department "would basically have concerns for [Child] being in her custody." After this warning, Grandmother "was very upset, so she was yelling" and "took off" with N.H. in a car seat from the hospital. In a parking lot near the hospital, officers were able to detain her, recover N.H., and take him back to the hospital. One of the officers testified that, while Grandmother was in the parking lot with the officers, Mother arrived, and Grandmother and Mother "seemed on the same side as far as not letting [N.H.] back into the hospital." He also testified that Grandmother was "yelling" and "seemed very agitated." Another responding officer testified that, after Grandmother left the hospital with N.H., the officers "actually had to physically restrain her in order to check the welfare of [N.H.]."

The Department also presented testimony of Grandmother's conflicting statements about her home circumstances, who was N.H.'s caregiver, and where he was living. The CPS investigation supervisor testified about Grandmother's "different statements regarding [N.H.]'s whereabouts and how he may have sustained the injuries or the cause of the injuries" leading up to Grandmother taking N.H. to the hospital. In "the same interview," Grandmother initially denied that N.H. was living in her home, telling the supervisor that she lived with Child and her teenage son. When she acknowledged that she had N.H., she told the supervisor that she shared a room with N.H., and Child and her teenage son shared a room. She also told the supervisor that N.H. lived with someone other than Mother before N.H. "came to be with [her]," but she did not know the prior caretaker's name. One of the responding officers also testified that Grandmother told him that she was N.H.'s primary caregiver, and the hospital social worker

4

testified that Grandmother told her that she was N.H.'s primary caregiver, that N.H. and her son lived with her, and she did not mention Child.

The Department also presented evidence about its concerns for Child's safety stemming from Grandmother's mental health and her attempts to defend and protect Mother's interests. Evidence showed that Grandmother's mental health and her relationship with Mother were impacting her ability to safely care for and protect a young child. A conservatorship supervisor testified that Grandmother's "behavior [had] become more erratic," and the CASA supervisor testified about Grandmother's "alarming" behavior. The psychiatrist who evaluated Grandmother in May 2019 testified that she was unreliable and had "impaired" and poor judgment "enough that [care for] a small child would not be a good idea."[2] He testified that Grandmother continued to defend Mother as a "fit caretaker" and "endorse[d] corrupt motives and conspiracy-type theories about everyone from the hospital to administration to the State, the [Department]."

Evidence showed that, when asked to provide contact information for Mother, Grandmother did not do so despite being in regular contact with Mother, and Grandmother continued to defend Mother who had an "extensive criminal history that include[d] child abuse charges" and had been found to be a danger to her children. The Department had removed Mother's twelve children from her. Around the same time that Child was removed from Grandmother in August 2018, the Department removed Mother's one-year-old child from

---

[2] Consistent with his testimony, the psychiatrist's written evaluation concluded:

> Inasmuch as she is patently disingenuous, that is, consciously prevaricating with officials, and very impulsively attempted to run off with her injured grandchild, there is no question but that she is not a safe, competent or adequate caregiver for [Child] or any small child, due to mental illness.

Mother's care. The Department also removed Mother's child, E.P., who was born in July 2019, shortly after he was born. The birth verifications for these two children listed a different name other than Mother's, and Grandmother did not cooperate with the Department after the Department obtained legal custody of the children. The children were missing for several weeks before the Department was able to locate them. A CPS employee testified that, when the employee asked Grandmother for assistance in locating Mother's one-year-old child, Grandmother denied knowing that child, where that child was, or "who [Mother] was" and would not let the employee into her home. The employee also testified that video footage showed Grandmother at the hospital on the day E.P. was born but, when the employee asked Grandmother for assistance in locating E.P., Grandmother was not cooperative and would not respond to questions.

The conservatorship determination was submitted to the jury, and the jury found that the order designating Grandmother the sole managing conservator of Child should be modified to appoint the Department as the sole managing conservator. The trial court thereafter entered the modified final decree of conservatorship in accordance with the jury's verdict. This appeal followed.

**Analysis**

A party seeking to modify an order that provides for the appointment of a conservator of a child must establish that the modification would be in the child's best interest and, relevant to this appeal, that "the circumstances of the child, a conservator, or other party affected by the order have changed materially and substantially since . . . the date of the rendition of the order." Tex. Fam. Code § 156.101. In her sole issue, Grandmother challenges the legal

and factual sufficiency of the evidence to support that a material and substantial change of circumstances had occurred to either her or Child.

**Standards of Review**

In this case, the jury determined the conservatorship issue. *See id.* § 105.002 (authorizing party to demand jury trial and stating that court may not contravene jury verdict on specified issues, including appointment of sole managing conservator). In this context, a legal sufficiency challenge may be sustained when the record discloses one of the following situations: (i) a complete absence of evidence of a vital fact; (ii) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (iii) the evidence offered to prove a vital fact is no more than a mere scintilla; or (iv) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *see Lenz v. Lenz*, 79 S.W.3d 10, 13 (Tex. 2002) (describing review of no-evidence point). "When reviewing a jury verdict to determine the factual sufficiency of the evidence, the court of appeals must consider and weigh all the evidence[] and should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

Under either scope of review, we view the evidence in the light most favorable to the finding, "crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *City of Keller*, 168 S.W.3d at 807. If reasonable people could differ in their conclusions, we will not substitute our judgment for the jury's, and we must defer to the jury's reasonable determinations of the credibility of the witnesses, the weight to be given to their testimony, and the resolution of evidentiary conflicts. *Id.* at 819–20,

822; *Harris v. Texas Dep't of Family & Protective Servs.*, 228 S.W.3d 819, 822–23 (Tex. App.—Austin 2007, no pet.).

**Material and Substantial Change of Circumstances**

Grandmother does not argue that the evidence was insufficient to prove that the modification of conservatorship from her to the Department was in Child's best interest. Her challenge is limited to the sufficiency of the evidence to support the threshold requirement of a material and substantial change in circumstances. *See Zeifman v. Michels*, 212 S.W.3d 582, 589 (Tex. App.—Austin 2006, pet. denied) (explaining that threshold inquiry in conservatorship modification action is whether there has been material and substantial change in circumstances since date of rendition of order). She argues that "[t]here was no evidence produced at trial that [her] or [Child]'s circumstances had materially and substantially changed prior to the Department creating the change by removing [Child] from [Grandmother]'s care."

To prove that a material and substantial change in circumstances has occurred, "the petitioner must demonstrate what conditions existed at the time of entry of the prior order as compared to the circumstances existing at the time of the hearing on the motion to modify." *Id.* "The petitioner must show what material changes have occurred in the intervening period." *Id.* The petitioner's burden of proof in this context is a preponderance of the evidence. *Id.*; *Taylor v. Texas Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 641, 653 (Tex. App.—Austin 2005, pet. denied); *see* Tex. Fam. Code § 105.005 (stating that findings under this Title "shall be based on a preponderance of the evidence" unless otherwise stated). Further, "whether a material and substantial change of circumstances has occurred is not guided by rigid rules and is fact specific." *Zeifman*, 212 S.W.3d at 593; *see Miller v. Miller*, No. 03-14-00603-CV,

8

2015 Tex. App. LEXIS 11319, at *9 (Tex. App.—Austin Nov. 4, 2015, no pet.) (mem. op.) (listing examples of material changes in circumstances and explaining, "[w]hether a particular change is material and substantial depends on the circumstances of each case").

Characterizing Child's removal from her care as "improper," Grandmother argues that if "an improper removal of child from his managing conservator can form the basis of a material and substantial change of circumstances to support modification," that would "eviscerate[] the very purpose of the requirement." For this reason, Grandmother argues that the relevant "window of time" for determining if a material and substantial change in circumstances has occurred is "from the date of the prior order granting custody to the time that the Department petitioned the trial court to remove the child from her care" and that, "under this paradigm, the Department did not meet its burden."

This Court, however, has concluded that the relevant time period is the "intervening period" between the prior order and the "circumstances existing at the time of the hearing on the motion to modify." *Zeifman*, 212 S.W.3d at 589. Here, during the intervening period between the trial court's prior order and the August 2019 jury trial, multiple witnesses testified about Grandmother's deteriorating mental health and their concerns about her ability to safely care for a young child. The jury could have credited this evidence to conclude that there had been a material and substantial change in Child's or Grandmother's circumstances that supported modification of conservatorship. *See Warren v. Ulatoski*, No. 03-15-00380-CV, 2016 Tex. App. LEXIS 8650, at *2 (Tex. App.—Austin Aug. 11, 2016, pet. denied) (mem. op.) (observing that "[caregiver]'s behavior showing that he or she has become an improper person to exercise custody" has been found to be circumstance supporting modification order).

9

The evidence also showed that Grandmother placed Mother's interests over the interests of very young children during the intervening time period. When she was asked to assist the Department in locating Mother's missing children, Grandmother denied knowing "who [Mother] was" and did not cooperate in locating Mother's missing children, one of whom was born in July 2019. Evidence showed that Grandmother stayed in regular contact with and defended Mother after she was provided with proof that Mother was a danger to her very young children. *See Zeifman*, 212 S.W.3d at 593–94 (explaining that "courts have allowed changes to be proved in a variety of ways" and discussing changed circumstances that courts have found to be substantial and material).

Further, even if the "window of time" closed when the Department petitioned to remove Child, the jury could have credited the evidence about Mother's other child N.H., his injuries, and Grandmother's conduct at the hospital in August 2018 to find a material and substantial change in circumstances. N.H. was born in July 2018, which was after the trial court rendered the prior order, and evidence supported findings that he was living with Grandmother after he was born; he was nonverbal and nonmobile when he was injured; his fractures were unexplained and caused by trauma; and Grandmother was N.H.'s primary caregiver. *See id.*; *see also Warren*, 2016 Tex. App. LEXIS 8650, at *2 (observing that "change in home surroundings" has been found to be change in circumstances to support modification order); *Miller*, 2015 Tex. App. LEXIS 11319, at *9 (same). Although evidence was presented that supported that another person was taking care of N.H. when he was injured, the evidence showed that Grandmother tried to remove N.H. from the hospital despite being warned of the consequences of doing so and that officers "actually had to physically restrain her in order to check the welfare of [N.H.]." The jury could have credited the evidence of Grandmother's conduct surrounding

N.H. to find that there had been a material and substantial change of circumstances for Grandmother or Child.

Viewing the evidence under the applicable standards of review, we conclude that the evidence was legally and factually sufficient to support a finding of material and substantial change of circumstances. *See City of Keller*, 168 S.W.3d at 810; *Cain*, 709 S.W.2d at 176; *Zeifman*, 212 S.W.3d at 589. Thus, we overrule Grandmother's issue.

## Conclusion

Having concluded that the evidence was legally and factually sufficient to support that there had been a material and substantial change in the circumstances of Grandmother or Child, we affirm the trial court's modified final decree of conservatorship.

_____

Melissa Goodwin, Justice

Before Justices Goodwin, Kelly, and Smith

Affirmed

Filed: March 5, 2020

11